**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
U.S. COURTHOUSE
402 E. STATE STREET
TRENTON, NEW JERSEY 08608

Hon. Michael B. Kaplan  
United States Bankruptcy Judge

609-989-0478  
609-989-2259 Fax

March 16, 2011

John T. Ambrosio  
Ambrosio & Chiaia  
105 Grove Street  
Suite 14  
Montclair, New Jersey 07042  
Attorney for Plaintiff, Karen Pfeiffer

Gregg F. Wulster, Pro Se  
65 Cedar Lake Road  
Blairstown, New Jersey 07825

    Re: Pfeiffer v. Wulster  
      Case No. 09-13388 (MBK)  
      Adv. Proc. No. 09-02015 (MBK)

Counselors:

  The Court has held a proof hearing and has reviewed the submissions filed in the above referenced matter. The Court issues the following ruling:

  The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J). Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and § 1409. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

This matter is before the Court upon the request filed by Plaintiff Karen Pfeiffer ("Plaintiff") to strike Debtor-Defendant Gregg Wulster's ("Debtor" or "Defendant") pleadings for failure to provide discovery. On November 16, 2010, the Court entered said Order. The Court entered a subsequent order on January 11, 2011 denying Defendant's Motion for Reconsideration. However, before entering a default judgment against the Defendant, the Court scheduled a proof hearing with respect to Plaintiff's complaint seeking to declare certain debts nondischargeable pursuant to 11 U.S.C. § 523. The proof hearing was held on February 18, 2011, to determine whether Plaintiff established a *prima facie* case and, if so, to ascertain the scope of damages owing to her.

Rule 55(b)(2) of the Federal Rules of Civil Procedure, made applicable in the bankruptcy court pursuant to Fed. R. Bankr. P. 7055, states that "the court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Id.; Chelekapalli v. Ramagiri, 2009 WL 1297749 (D.N.J. 2009). In In re Park, 272 B.R. 323 (Bankr. D.N.J. 2001), Chief Judge Wizmur set forth the process by which a party may obtain a default judgment:

> Obtaining a default judgment involves a two-step process. First, default must actually be entered against the non-appearing party. Second, after the entry of default, the movant must request the entry of a default judgment . . . The entry of default does not automatically entitle the nondefaulting party to the entry of a default judgment. In re Beltran, 182 B.R. 820, 823 (9th Cir. BAP 1995); In re Villegas, 132 B.R. 742, 746 (9th Cir. BAP 1991): In re Ripple, 242 B.R. 60, 63 (Bankr. M.D. Fla. 1999): In re Sziel, 206 B.R. 490, 493 (Bankr. N.D. Ill. 1997), reconsideration denied, 209 B.R. 712. Instead, the general effect of an entry of default is to deem the allegations contained in a complaint as admitted. Beltran, 182 B.R. at 823; Sziel, 206 B.R. at 493; In re Cruz, 198 B.R. 330, 332 (Bankr. S.D. Ca. 1996). Accordingly, a defaulting party may not attack the factual allegations in a complaint; however, that does not mean that the party admits to the legal conclusions made in the complaint. Soshnik v. Bruens, 851 F.2d 361, 1988 WL 69804, *1 (9th Cir. June 22, 1988) ("only factual allegations are admitted by default, not liability or legal conclusions") . . . "Even after default it remains for the court to consider whether

the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit to mere conclusions of law." In re Wildlife Center, Inc., 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989).

Id. Accordingly, to be entitled to entry of a judgment by default, the "plaintiff must demonstrate a *prima facie* case by competent evidence." In re Bui, 188 B.R. 274, 276 (Bankr. N.D. Ca. 1995).

## I.   Facts

### A. Real Property

Plaintiff seeks nondischargeability of $150,000 as a result of Debtor's alleged systematic engagement in conduct calculated to deprive Plaintiff of use and enjoyment of their shared residential property, to prevent Plaintiff from recouping any of her equity in the premises, and to leave Plaintiff with the sole responsibility of repaying a substantial amount of debt incurred to acquire and construct the premises. Plaintiff and Debtor commenced a romantic relationship in or around 1997, and subsequently had two children together. On January 15, 2002, Plaintiff and Debtor purchased vacant land from the Debtor's mother located at 65 Cedar Lake Road, Blairstown, New Jersey 07825 ("Cedar Lake Road premises"). The Cedar Lake Road premises was titled in the name of Plaintiff and Debtor as tenants in common. The total consideration paid to acquire title to the Cedar Lake Road premises was $40,000 which Plaintiff secured by placing a second mortgage on her then-residence located in Pennsylvania. Thereafter, Plaintiff obtained a construction loan secured by a first mortgage on the Cedar Lake Road premises, and in or around June 2002, commenced construction of a single family residential dwelling. Eventually, the construction loan was converted to a conventional mortgage held by Huntington Bank in the principal amount of $320,000. In addition to the mortgage financing and construction loan,

3

Plaintiff withdrew $26,600 from an MBNA credit card account in order to finance the construction of the residence.

Plaintiff and Debtor resided in the Cedar Lake Premises together for approximately five years. After the relationship between the parties deteriorated, Defendant, pursuant to State Court Order, was forced to vacate the Cedar Lake Road premises. Without the contributions of the Debtor, Plaintiff defaulted on the Cedar Lake Road mortgage. At that time, the parties decided to sell the property. According to Plaintiff, Defendant intentionally frustrated the sale process of the Cedar Lake Road premises. Plaintiff specifically alleges that Defendant's delay in accepting viable offers caused many offers to be rescinded. Additionally, Plaintiff alleges that Defendant conditioned approval of a sale on certain lot line adjustment and deed restriction requests, further interfering with the sale of the property.

In the Fall of 2008, Defendant offered to pay Plaintiff $110,000 for her one-half interest in the Cedar Lake Road premises in two $55,000 installments. Pursuant to an October 27, 2008 consent order executed between Plaintiff and Defendant in the Warren County Family Court, the first $55,000 installment was to be paid by November 17, 2008. Defendant made this initial payment. The Order further provided that the arrangement was contingent upon Defendant's ability to secure a mortgage on the property. Defendant was unable to do so. Shortly after, the Cedar Lake Road premises was sold at Sheriff's sale for $372,342.42.

### B. Credit Card and Check Forgeries

Plaintiff additionally alleges that, commencing in or around 2002 and continuing through June 2004, Debtor, without the knowledge or consent of the Plaintiff, took cash advances from various credit card accounts opened in the Plaintiff's name by forging Plaintiff's signature on credit card convenience checks. As each credit card statement was mailed to their residence,

Debtor allegedly followed a practice of intercepting the statements. As a result, Plaintiff failed to discover that Debtor had been routinely taking cash advances from Plaintiff's personal credit account until June 2004. The unauthorized cash advances taken by the Defendant total $44,037.30. Of this amount, Defendant has reimbursed Plaintiff in the amount of $21,297.15. In proofs submitted at the hearing and attached herewith, Plaintiff alleges that Debtor still owes her $9,800, plus interest, as a result of the conversion of the Plaintiff's credit.

Further, Plaintiff alleges that Defendant forged her signature on a $6,000 trust account check issued by the Kimmel & Silverman law firm, made out to both Plaintiff and Defendant, and deposited same into his personal account. The monies were paid to Plaintiff in satisfaction of a lemon law settlement on a Ford F350 Truck. Plaintiff paid for the truck on her credit account with Ford and the truck was titled solely in Plaintiff's name. Accordingly, Plaintiff seeks a nondischargeable claim for the conversion of the $6,000 settlement check.

## II.    11 U.S.C. § 523(a)(6)

Section 523(a)(6) prevents discharge of a debt resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. 523(a)(6). The United States Supreme Court, in <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), established that § 523(a)(6) does not apply to debts arising from unintentionally inflicted injuries. 523 U.S. at 61-62, 118 S.Ct. 974. Specifically, <u>Geiger</u> elaborated on the definition of "injury," holding that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." <u>Id.</u> As such, negligence or recklessness is not sufficient to establish that a resulting injury is willful and malicious. <u>Id.</u>

The willful prong of 523(a)(6) "is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002). "The subjective standard correctly focuses on the debtor's state of mind and precludes application of 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that the harm to the creditor was substantially certain." Id. at 1146. As the Debtor's actual intent may be difficult to glean, subjective intent may be ascertained by circumstantial evidence. Id. at 1146 ("In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."). The malicious prong is separate and distinct from the willful prong and "[i]nvolves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1209 (9th Cir. 2001) (internal citations omitted). Malice can be inferred based on the nature of the wrongful act. Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 554 (9th Cir. 1991). To infer malice, however, it must first be established that the conversion was willful. In re Thiara, 285 B.R. 420, 434 (9th Cir. BAP 2002); In re Ingalls, 2010 WL 624089 (Bankr. D.N.J. 2010).[1]

The standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a), including that for willful and malicious activities causing injury, is the preponderance-of-the-evidence standard. Thus, Ms. Pfeiffer must prove that it is more likely than not that Mr. Wulster's acts

---

[1] Plaintiff relies on In re Page, 197 B.R. 61, 63 (Bankr. N.D. Ohio 1996), a decision which predates Geiger, for the proposition that under exception to discharge for willful and malicious injury, "'maliciousness' requires a showing of 'conscious disregard of one's duties or without just cause or excuse; *It does not require ill-will or specific intent to do harm.*" (citing Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986) (Emphasis added). Be that as it may, Plaintiff must first satisfy the willful prong which *does*, in fact, require a showing of intentionality with respect to the injury-producing conduct. As discussed in detail below, Plaintiff has failed to overcome this hurdle.

were willful and malicious as defined by the Bankruptcy Code. Furthermore, courts must narrowly construe the discharge exceptions in Section 523(a) in favor of the debtor, bearing in mind the goal of the bankruptcy code to afford the debtor a fresh start. In re Berman, 629 F.3d 761, 765 (7th Cir. 2011); In re Hawkins, 231 B.R. 222, 228 (D.N.J. 1999).

### A. Cedar Lake Road Premises

With respect to the Cedar Lake Road premises, the Court finds that Plaintiff has failed to demonstrate a *prima facie* case under § 523(a)(6) – namely, Plaintiff has failed to provide competent proofs evidencing that Defendant willfully and maliciously caused injury to the Plaintiff by interfering with the sale of the subject property. In support of her claim, Plaintiff testified that Defendant requested certain lot line adjustments and deed restrictions in an effort to thwart the sale process. However, Plaintiff failed to provide evidence evincing that these requests were undertaken with the "subjective motive to inflict injury" or that Defendant believed it to be substantially certain that Plaintiff would be injured as a result. § 523(a)(6); In re Su, 290 F.3d at 1142. Moreover, Plaintiff conceded that Defendant cooperated with realtors and allowed the Cedar Lake Premises to be shown to potential buyers.

The proofs and testimony elicited at the hearing further reveal that the Defendant had a genuine interest in purchasing the Plaintiff's interest in the Cedar Lake Road premises. In furtherance of that end, Defendant paid Plaintiff the sum of $55,000 to secure the premises, as was agreed to in the October 27, 2008 Consent Order executed between the parties in the Warren County Family Court.[2] The Court believes this conduct shows Defendant's intent to consummate the transaction and the Defendant's good faith in that regard. The Court acknowledges that the sale was never consummated because, as noted above, Defendant was

---

[2] The $55,000 payment was held in an escrow account at Mr. Wulster's attorney's office.

7

unable to obtain a mortgage commitment to refinance the existing mortgage on the Cedar Lake Road premises. However, there is no suggestion that Defendant's inability to refinance the existing mortgage was the result of any calculated wrongdoing. As such, Plaintiff has failed to demonstrate that Defendant harbored a subjective intent to injure the Plaintiff through his actions. At most, Defendant's actions were undertaken to benefit him. This, in and of itself, is insufficient to meet the "willful" standard. As Plaintiff must satisfy both the "willful" and "malicious" prongs to prevail on a § 523(a)(6) claim, the Court finds it unnecessary to address whether Defendant's conduct was "malicious." Accordingly, the Court rules that any and all debts owing to Plaintiff arising from the sale of the Cedar Lake Road premises are dischargeable.

### B. Credit Card and Check Forgeries

Ms. Pfeiffer further claims that the monies owed to her as a result of Mr. Wulster's credit card convenience check and trust account check forgeries are nondischargeable under § 523(a). The Court agrees with Plaintiff and finds that the debt owed to Plaintiff is the result of the Defendant's conversion of the Plaintiff's property, namely, Defendant's unauthorized taking of Plaintiff's credit and his diversion of funds intended for Plaintiff.[3] Conversion is covered by the § 523(a)(6) statutory language. In re Sandoval, 341 B.R. 282, 295 (Bankr. C.D. Cal. 2006); See Del Bino v. Bailey (In re Bailey), 197 F.3d 997, 1000 (9th Cir. 1999).

While bankruptcy law governs whether a clam is nondischargeable under § 523(a)(6), the court must look to state law to determine whether the Defendant's actions fall within the tort of conversion. Accordingly, New Jersey law defines conversion as "the intentional exercise of dominion or control over personal property that seriously interferes with the right of another to control it." Pollen v. Comer, 2007 WL 1876489, at *11 (D.N.J. 2007); Chicago Title Ins. Co. v.

---

[3] In Plaintiff's complaint, Plaintiff seeks nondischargeability on this count under the § 523(a)(2) exception for fraud. However, the Court has determined that Defendant's conduct is better understood as a "willful and malicious injury" to Ms. Pfeiffer and her property. See § 523(a)(6).

8

Ellis, 409 N.J. Super. 444, 978 A.2d 281 (App. Div. 2009) ("The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property."). New Jersey law has applied the tort of conversion to money where the sum of money belonged to the injured party and is identifiable. Glenfed Fin. Corp. v. Penick Corp., 276 N.J. Super. 163, 181, 647 A.2d 852 (App. Div. 1994); Key Corporate Capital, Inc. v. Tilley, 216 Fed.Appx. 193, 195-96 (3d Cir. 2007). Conversion, however, is not a per se willful and malicious injury to the property of another. Peklar v. Ikerd (In re Peklar), 260 F.3d 1035, 1037 (9th Cir. 2001). Consequently, to prevail on her claim of nondischargeability, Ms. Pfeiffer must first establish that a conversion has occurred under New Jersey law, and second, that the conversion is willful and malicious. In re Sandoval, 341 B.R. at 295.

First, the Court rules that Defendant's conduct amounts to conversion under New Jersey law. It is without question that the credit cards are property of the Plaintiff. The accounts were exclusively in the Plaintiff's name, the convenience check offers were addressed to Plaintiff alone, and Plaintiff was solely responsible for any and all charges on each credit card account. The same can be stated as to the lemon law settlement check. Despite the fact that the check was in both Plaintiff's and Defendant's names, as aforementioned, the Ford F350 Truck was titled in the Plaintiff's name alone and purchased solely by the Plaintiff. With respect to both, Defendant misrepresented his interest in the property while interfering with the Plaintiff's rightful interest in same. In the process, Defendant deprived Plaintiff of the ability to control her accounts, access her credit and effectively manage her finances. As such, Plaintiff has sufficiently established that Defendant's appropriation of Plaintiff's credit cards and settlement monies by fraudulent means constitute conversion as defined under New Jersey law.

Second, the Court finds that this conversion was willful and malicious within the meaning of § 523(a)(6). The Court infers from the evidence adduced at trial that Mr. Wulster knew that drawing over $40,000 on several of Plaintiff's credit cards, without express or implied consent, and forging her signature in the process, was substantially certain to harm the Plaintiff. See In re Lee, 304 B.R. 344, 349 (Bankr. N.D. Illinois 2004) ("It can be assumed . . . that Plaintiff's credit card . . . was [her] 'property,' or at least that any charging on the card without consent would harm Plaintiff's assets and liabilities.") In that regard, Mr. Wulster has offered no just cause or excuse for his conduct.[4] Moreover, based on Plaintiff's testimony, the Court finds that Defendant must have known that his calculated theft of the lemon law settlement proceeds would injure the Plaintiff. This is particularly true in light of the Defendant's awareness and contribution to the parties mounting debt. Had Plaintiff been able to maintain control of her property, it is likely that she could have used the proceeds toward paying down this debt. Instead, Plaintiff's obligations continued to grow. In sum, the Court is persuaded that Defendant intentionally converted Plaintiff's property, without justification or excuse, resulting in injury to the Plaintiff. This conduct constitutes a willful and malicious injury within the meaning of § 523(a)(6). In re Littleton, 942 F.2d at 554.

Finally, the Court must determine the amount of damages owing to Plaintiff as a result of Defendant's violation of § 523(a)(6).[5] The unauthorized cash advances taken by the Defendant total $44,037.30. However, Defendant has already reimbursed Plaintiff for these unauthorized advances in the amount of $21,297.15. According to the summary of debts chart provided by

---

[4] In Mr. Wulster's March 11, 2011 letter to the Court, he again fails to provide any explanation or justification for his conduct with regard to the credit card and check forgeries.

[5] The Court pauses to express its frustration with the proofs presented at the hearing and the resulting difficulty the Court experienced in attempting to determine the exact amount due and owing to Plaintiff. The testimony provided at the proof hearing was wholly inconsistent with earlier submissions, several exhibits presented at the hearing, and the summary chart of debts due and owing to Plaintiff. Without the ability to cure these inconsistencies, the Court has no alternative but to rely on the summary of debts chart presented at the hearing as this summary is Plaintiff's own admission of what is due and owing to her. The summary of debts chart is attached herewith.

10

Plaintiff, Defendant still owes Plaintiff $9,800.[6] The remaining balance has been satisfied.[7]

Next, the proceeds of the Ford lemon law settlement total $6,000. Accordingly, the Court finds that Defendant owes Plaintiff $15,800 in nondischargeable debt.

### III.    Conclusion

For the foregoing reasons, this Court finds that the debts owing to Plaintiff from Defendant arising from the sale of the Cedar Lake Road Premises are dischargeable under § 523(a)(6). However, the Court finds that Plaintiff demonstrated a *prima facie* case by competent evidence with respect to the debts due and owing to Plaintiff arising from the unauthorized cash advances and forgeries. As such, Plaintiff is entitled to entry of a nondischargeable default judgment in the amount of $15,800 with respect to said debts. The Court will enter judgment accordingly.[8]

_____
Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[6] The Court notes that it is not awarding Plaintiff the interest payments she requests.
[7] On the summary of debts chart, for example, Plaintiff admits that the balance, as of August 2004, on the Discover and Chase credit card accounts is zero.
[8] Lastly, Mr. Wulster, in his March 11, 2011 letter to the Court, requests that the $20,000 he borrowed from his mother that is being held in an escrow account be returned, in full, along with all pre-judgment interest from November 14, 2008. At this juncture, Mr. Wulster is in no position to request relief from this Court. Accordingly, the Court denies Mr. Wulster's request.

**Debts due Plaintiff (Karen Pfeiffer) from Defendant (Gregg Wulster)**
**Submitted 2-27-2011**

Mr. Wulster was an authorized user on ONLY one credit card belonging to Plaintiff - Citibank from December 31, 2001 to February 6, 2004 (letter attached). He was removed as an authorized user because he stopped paying his share, which he had been previously paying with forged checks from other credit card accounts. Attached is just one example of him paying Citibank with a forged check from MBNA. <u>He forged checks to hide the LIE that he was working every day and paying ½ the bills</u>. I did not discover his forged checks until sometime around March of 2004 as many of the cards had no balance so I was not looking for the bill. The accounts become commingled (in 2003) with debts I knew we had from the construction of the home on 65 Cedar Lake Road (2 MBNA accounts, Discover, and Citibank), was paying on, and was beginning to miss in the mail. That's how I finally caught him (March 2004) and figured out what he was doing and the full extend of his deceit, theft, and lies. He told me he would pay off balances of all credit cards in lieu of prosecution (more lies).

| Debt | Original/High Balance | What Defendant Paid August 2004 | Balance as of August 2004* |
|---|---|---|---|
| Mortgage (Obtained 8/2001)on Plaintiff's home (of 1997-2002) in Stroudsburg, PA (used to buy the 65 Cedar Lake Rd. property; had to sell home to pay the debt in March 2009; pay off attached) | $40,000.00 $16,712.94 (interest documents attached) | | Approximately $37,213.64 (+ interest until payoff in 2009) |
| MBNA Account # 5200 010212921189 – Deposited in my checking account for home construction 6-21-2002;some transferred to other MBNA account for a time, then transferred to Chase Account # 4357-8749-4001-8582 on 8-13-05 for better interest rate | $26,600.00 | $15,900.00 | $10,000.00 |
| MBNA Account # 5200-0102-1257-7486 Transferred to Providian on 9-30-2003 for 0% for, then to Citibank on 12-17-04 for 1.9% interest for life of note, which I am still paying today (balance as of 2-18-11 $3445.52, paying $100.00 per month for years – statement attached) | $24,625.68 | (Chase) $9742.19 (Providian) $400.00 | $9800.00 |
| Chase | ? | $6568.05 | $0 |
| Discover Account # 6011 0021 9065 8542 | ? | $4586.91 | $0 |
| Citibank (no forged checks on this account) | $28,000.00 | $18,503.74 | $0*** |
| Lemon Law (truck bill of purchase and sale attached)*** | $6000.00 | | $6000.00 |
| Totals | $141,938.62 | $55,700.89 | $63,013.64 |

*Point in time where all accumulating debt ceased (I changed my address to a P.O. Box in April 2004; home construction was complete June 2002) and Defendant attempted to pay his debts leaving balances unpaid.

**F350 Ford Truck which I purchased on my credit account with Ford, titled in my name, for which Defendant agreed to make all payments. He kept missing payments so I sold the truck. The dealer I sold it to paid of the note and gave me a check for $1800.00, which I used to pay the Defendant's share of mortgage payment. Paper work attached.

All said and done, Consent Order of October 28, 2009 SIGNED BY BOTH parties states that: $110,000 goes to Plaintiff and this resolves all debts between the parties and Plaintiff's equity in 65 Cedar Lake Road (a compromise on Plaintiff's part; home sold for $472,000.00 on January 15, 2010). Defendant did not comply with this order or numerous other orders in regards to property settlement since the very beginning, purposefully with deceit and malicious intent.